IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2018 Session

**STATE OF TENNESSEE v. THOMAS BETHEL HENDRIX**

**Appeal from the Circuit Court for Williamson County**
**No. II-CR047916   James G. Martin, III, Judge**

_____

**No. M2017-00386-CCA-R3-CD**

_____

A Williamson County Circuit Court Jury convicted the Appellant, Thomas Bethel Hendrix, of two counts of aggravated child abuse and one count of child abuse, and the trial court imposed a total effective sentence of twenty-five years in confinement. On appeal, the Appellant contends that the trial court erred by admitting certain statements he made to law enforcement and that the trial court erred by failing to merge his convictions into a single conviction of aggravated child abuse. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court but conclude that the Appellant's convictions must be merged. Accordingly, the case is remanded to the trial court for merger of the convictions into a single conviction of aggravated child abuse. We note that merger of the convictions does not affect the Appellant's twenty-five-year sentence because the trial court ordered that he serve the sentences concurrently.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed,**
**Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Gregory Burlison, Franklin, Tennessee, for the Appellant, Thomas Bethel Hendrix.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Kim R. Helper, District Attorney General; and Mary Katharine White and Tammy Rettig, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In April 2014, the Williamson County Grand Jury returned an indictment charging the Appellant in counts one and two with aggravated child abuse resulting in serious bodily injury and in count three with child abuse. Each count alleged that the offense occurred between January 4 and January 8, 2014.

The victim of the alleged crimes was the two-month-old son of the Appellant's then-girlfriend, Jennifer Barnes. Before trial, the Appellant filed a motion for a bill of particulars, and the State ultimately responded that count one referred to "injury to the victim's ribs/rib," count two referred to "injury to the victim's brain," and count three referred to "bruising of the victim's skin."

At trial, Barnes testified that she was originally from Detroit, Michigan, and that she had lived in Dickson, Tennessee, for approximately three years. She had two sons, WBB,[1] who was ten years old at the time of trial, and the victim, who was two years old at the time of trial. Barnes' relationship with the victim's father ended two weeks after she learned she was pregnant with the victim.

The victim was born on October 15, 2013, at twenty-nine weeks gestation. As a result of his premature birth, he had pulmonary lung disease, was placed in the Neonatal Intensive Care Unit (NICU), and was put on a ventilator and a respirator. Three days after the victim's birth, Barnes' long-time friend, Andrea Hendrix,[2] visited Barnes in the hospital. Andrea, who was married to the Appellant's brother, Ben Hendrix, brought the Appellant to the hospital with her, and the Appellant and Barnes met for the first time.

Shortly thereafter, Barnes was released from the hospital, but the victim remained in the NICU. At that time, Barnes was living with her friend, Tonya Pezzi, in Pezzi's apartment in Dickson. Barnes visited the victim in the hospital almost daily, and the Appellant usually accompanied her. Barnes and the Appellant quickly developed a romantic relationship, and they talked about getting married and renting an apartment together. Barnes spent some nights with the Appellant, who lived in a house with Ben and Andrea in Fairview.

Approximately two days before Thanksgiving, the victim was released from the hospital after forty-five days in the NICU. The victim continued to suffer from pulmonary issues, which required that he have weekly checkups with his doctor. He also had to be taken to the hospital on several occasions due to breathing issues. Notably, on December 24, 2013, Barnes took him to the hospital because he was sick and had labored

---

[1] This court will refer to the minors by their initials.

[2] Because several individuals in this case share a surname, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

breathing. A chest x-ray was taken that day. Barnes thought another x-ray was taken on January 3, 2014, during a follow-up appointment.

Barnes began working for Dunkin' Donuts in November or December 2013, and she had to leave for work about 4:15 a.m. While she was at work, WBB stayed with Barnes' father, who had late-stage cancer. Barnes usually left the victim with Jennifer Dructor, a babysitter who lived in the same apartment complex as Pezzi. Dructor's boyfriend, Eric Newberry, sometimes helped Dructor care for the victim. On other occasions, Angela or the Appellant watched the victim.

On Monday, January 6, 2014, Barnes worked until 4:00 p.m. The next day, January 7, the victim was ill, and Barnes stayed out of work to care for him. WBB stayed with Barnes' father, and Barnes and the victim stayed at Pezzi's apartment until approximately 6:00 p.m. Before leaving the apartment, Barnes changed the victim's diaper, dressed him in a "onesie," and put him in a "sleep sack." Barnes explained, "You put the baby into the sleep sack and you zip it up and it has two flaps that kind of wrap over the sides and kind of swaddle them." Barnes then retrieved WBB from her father's house and took her sons to the Appellant's house. The victim was asleep when they arrived, but he woke a couple of times while Barnes and the Appellant sat on the couch and watched television. Either the Appellant or Barnes held the victim when he woke; when he fell asleep, they put him in his car seat on the floor in front of the couch. The victim often slept in his car seat because sleeping at an angle helped his breathing.

Around 11:00 p.m., Barnes went into the bedroom of Angela's son, Dominic, to sleep, and she put the victim in his car seat beside the bed. The Appellant stayed in the living room to sleep on the couch. Barnes changed the victim's diaper right before she went to sleep and did not see any marks or signs of injury on the victim. The victim's behavior that day had been "perfectly fine," despite his illness.

Barnes woke around 1:00 or 2:00 a.m. because the victim was crying. She discovered he was not in his car seat beside the bed but was in the living room with the Appellant. Barnes called out and asked the Appellant if everything was okay. The Appellant sighed and responded, "[Y]eah, he's just having a really bad night tonight." After a few minutes, the victim's crying increased, and Barnes asked the Appellant to bring the victim to her. The Appellant did "a lot of huffing and puffing and sighing," and Barnes heard sounds that made her think the Appellant was changing the victim's diaper.

Barnes mentioned to the Appellant that no lights were on in the house, which was unusual. The Appellant explained that Ben and Angela were trying to save money on the electric bill; however, Barnes had never heard that they wanted to save money on electricity. Barnes asked the Appellant to turn on a light and make a fresh bottle for the victim. After complying, the Appellant brought the victim to Barnes, "kind of shoved" the victim at her, and said, "'[H]ere.'" Barnes thought the Appellant was acting

"frustrated and angry." Barnes fed the victim and rocked him, and he fell asleep while eating. Barnes put him back in his car seat beside the bed, and she went back to sleep.

Barnes woke about 4:00 or 4:30 a.m. on January 8 to get ready for work. About 5:30 a.m., she placed the victim in his car seat beside the couch where the Appellant was sleeping and shook the Appellant to tell him she was leaving. She took WBB to her father's house and headed to work.

Barnes initially went to the Dunkin' Donuts store in Fairview but was sent to the store in Dickson. She got off work about 12:00 or 12:30 p.m. and spent "several minutes" in the parking lot talking with a coworker about wanting to get a loan so she and the Appellant could rent an apartment. After the conversation, Barnes went into a nearby loan office to start the loan process. Upon leaving the loan office, Barnes went to her father's house, retrieved WBB, and returned to the Appellant's house.

When Barnes arrived around 1:00 p.m., the victim was still wearing his sleep sack. He was asleep in his car seat beside the couch; Barnes noted that the victim typically slept a lot during the day. Ben was home, asleep in his bedroom. Someone from the loan office called and asked Barnes to return to sign additional paperwork. Before leaving, Barnes asked if the Appellant wanted to go with her. He responded that he had things he needed to do on the computer, so he would stay home and watch Barnes' sons until she returned to get them for the victim's pediatrician appointment, which was scheduled for 4:00 p.m.

Barnes' return to the loan office took longer than she expected. Upon leaving the office, she called the pediatrician to advise she would be a little late for the appointment. She then called the Appellant and asked him to have the boys ready to go. The Appellant met her outside with the boys when she arrived. The Appellant told her that the victim had been "very agitated" and that he had spent much of the day trying to keep the victim quiet so the victim would not wake Ben. After both boys were in Barnes' car, the Appellant kissed Barnes and told her that he loved her. Barnes thought the Appellant seemed "rushed," "anxious," and "antsy."

Upon arriving a few minutes late for the 4:00 p.m. appointment at Old Harding Pediatrics, a nurse led Barnes and her sons into an exam room and told Barnes to undress the victim. As Barnes took the victim out of his sleep sack, she noticed that his hands were balled into fists and that one of his hands had what appeared to be marks of dirt or ink across the knuckles. Barnes licked her thumb and wiped at the marks, but they did not come off. Barnes picked up the victim, and his fists opened. On the palm of the marked hand, the victim had "a perfect circle of the same type of markings [she] had found on his knuckles." Barnes took the victim into the hall and summoned a nurse, who then summoned the pediatrician, Dr. Jennifer Ragsdale. The marks were determined to be bruises. Barnes had not seen the bruises before and did not know how they got there.

The pediatrician told Barnes to take the victim to Vanderbilt Children's Hospital (Vanderbilt).

While in the parking lot of the pediatrician's office, Barnes sent text messages to the Appellant about the bruises.[3] In the texts, Barnes asked why the victim was bruised and noted that the Appellant was the last person with the victim. The Appellant responded that he did not know how the victim was bruised, that he did not see bruises on the victim, and that Barnes forgot to put formula in the victim's bag. When Barnes specifically asked how the victim's fingers and palm were bruised, the Appellant replied that he had seen the bruises but had not drawn Barnes' attention to them. Barnes asserted that she did not injure the victim and that the victim was not bruised when she went to bed or when she fed the victim in the middle of the night. The Appellant responded, "Baby, [the bruises were] there when you took him to me in the morning. Maybe I swaddled him too hard and I won't do it again." Barnes again asserted that the bruises were not there when she went to bed and maintained that the victim had been swaddled the entire time he was at the Appellant's house. The Appellant insisted that he was 100% positive the victim had bruises the night before. Barnes responded that she had changed the victim's diaper before coming to the Appellant's house and that the victim had no bruises at that time. She had noticed the bruises immediately when she removed the swaddling at the pediatrician's office. The Appellant said, "I know. I didn't see [the bruises] until this morning." Barnes repeated that the victim was not bruised the night before and that the victim had been with only the Appellant. The Appellant responded, "I understand this. I never accused you." Barnes cautioned the Appellant that if the victim's bruises had been caused by child abuse, their relationship was over. At that point, Barnes stopped sending the Appellant text messages and drove to the hospital.

Upon arriving at the hospital, the victim was rushed to the Intensive Care Unit (ICU) where he was completely undressed and full body x-rays, a CT scan, and an MRI were performed. In the midst of the testing, Barnes learned the victim had bruises and bleeding on the brain. Barnes then sent the Appellant additional text messages. She told the Appellant that their relationship was over, that she could not risk her children for the Appellant, that the victim had bleeding on his brain, that the victim was just a baby, and that bleeding on the brain did not just happen. The Appellant replied that he never did anything. Barnes stated, "[Y]ou were the only one that's been around him since Monday besides myself and he has blood on his brain now. And there's these marks that were not here yesterday. And I know I didn't do anything." Barnes then stopped exchanging text messages with the Appellant.

Barnes called the Appellant's cellular telephone after 10:00 p.m. on January 8 and discovered that his telephone number had been changed. She said, "I immediately went

---

[3] Copies of the text messages exchanged by Barnes and the Appellant on the night of January 8, 2014, were introduced as exhibits.

to social media because we were friends on Facebook and . . . I was deleted, I was blocked, I couldn't even find him."

At some point on the night of January 8, Detective David Bohler came to the victim's hospital room. Barnes spoke with him and showed him the text messages she and the Appellant had exchanged.

Detective Bohler returned to the hospital the next day, January 9, and asked if Barnes would make a recorded controlled telephone call to the Appellant. She agreed, and Detective Bohler "prompted" her to say certain things to the Appellant. Because she knew of no other way to contact the Appellant, Barnes called his workplace, a Sonic restaurant in Fairview. During the call, the Appellant accused Barnes of being vindictive, being crazy, and wanting to press charges against him. Barnes denied his accusations and explained she only wanted to find out what happened to the victim. The Appellant said he and Dructor were afraid of Barnes. At trial, Barnes acknowledged that she was "a northern girl" who "grew up in Detroit" and that her tone of voice could come across as "forceful," "overbearing," and "loud." However, she denied ever doing anything to make the Appellant or Dructor afraid of her.

Also on January 9, Dr. Lowen informed Barnes that the victim had multiple rib fractures, which shocked Barnes. Barnes told Dr. Lowen she felt guilty for failing to protect the victim. Barnes denied injuring the victim, saying that she loved her children and would never hurt them.

Barnes testified that the Appellant never showed her the bruises on the victim. Additionally, the Appellant did not show any remorse or concern for the victim during the call. The Appellant never came to visit the victim during the three or four days he was in the hospital, and the Appellant did not ask about the victim's welfare. Contrastingly, Dructor was upset and concerned about the victim's injuries, did not cease contact with the victim and Barnes, and continued to watch the victim for months after his release from the hospital.

Barnes testified that she was "heartbroken" by the Appellant's lack of care or interest, especially because the Appellant had shown interest in being the victim's "father figure." Barnes continued to take the victim to all of his doctor's appointments, as she had since his birth. At the time of trial, Barnes and her sons were living in an apartment in Dickson.

On cross-examination, Barnes acknowledged that her sons did not have the same father and that she had full custody of both boys. Barnes had been diagnosed with uterine cancer when she was twenty-seven years old. She was told she would not be able to have more children and was surprised when she became pregnant with the victim.

- 6 -

Barnes testified that after meeting the Appellant, their relationship developed quickly. The Appellant was very fond of the victim. He also liked WBB, but it "seemed like there was a bit of jealousy between [them] over [Barnes'] time." The victim required more attention than most babies because he had medical issues due to his premature birth. Barnes never saw the Appellant harm the victim and noted that he volunteered to get up with the victim in the night so she could sleep.

Barnes recalled that sometime between 1:00 and 3:00 a.m. on January 8, she woke because the victim was crying. She thought she heard the Appellant change the victim's diaper because she "hear[d] the sounds that a disposable diaper [makes] when you take off the tabs." After the Appellant brought the victim to her, she spent twenty or thirty minutes feeding and rocking the victim before he fell asleep.

Barnes stated that she may have gotten off work about 11:00 a.m. and estimated that she talked with a coworker for twenty or thirty minutes before going to a nearby loan office. About 1:30 p.m., she was called back to the loan office from the Appellant's house. Afterward, she picked up her sons and arrived at the pediatrician's office at 4:05 p.m.

Barnes recalled that while at Vanderbilt, she spoke with Detective Bohler and with an employee of the Department of Children's Services (DCS) for thirty to sixty minutes. She thought Detective Bohler arrived at the hospital around 7:00 p.m. At Detective Bohler's request, Barnes agreed to make a controlled call to the Appellant to find out what happened to the victim. Barnes acknowledged that Ben was home that day but stated that he was asleep in his room and hard to wake.

Barnes thought the issue was important enough to warrant calling the Appellant while he was working. During the call, the Appellant said he did not know what happened to the victim but wished he knew. When Barnes asked the Appellant if the injuries were the result of an accident, the Appellant denied "actively" harming the victim. Although the Appellant had said he loved her and wanted to marry her, he told her their relationship was over because of her accusations in the text messages. He did not try to convince her to work things out.

Barnes stated that after she left for work on the morning of January 8, the Appellant was the only person who interacted with the victim, noting that Andrea was at work, Ben was asleep in his bedroom, and Dominic was at school.

Dr. Jennifer Ragsdale testified that she had been the victim's doctor since he was discharged from the hospital after his premature birth. She noted that the victim was born at twenty-eight weeks gestation and that babies born that prematurely had problems with lung development. Shortly after the victim's discharge from the NICU in November, the victim caught a cold, and he was seen at the Vanderbilt emergency room two or three

times for breathing problems. Specifically, the victim was seen at Vanderbilt on December 24, 2013. On January 2, 2014, Dr. Ragsdale's partner in the pediatric practice saw the victim at a follow-up appointment and ordered x-rays, which were performed the next day, January 3.

On January 8, 2014, Barnes brought the victim to the office because of "fussiness." She and the victim were led into the exam room, and she was asked to undress him. Afterward, she took him across the hall to be weighed and have his temperature taken. Dr. Ragsdale thought that as the victim was being weighed, his hand opened, and Barnes and the nurse "noticed a large purple spot on this hand." Thereafter, the nurse asked Dr. Ragsdale to look at the victim's hand. Dr. Ragsdale saw a large purple bruise in the middle of the victim's palm and a line of bruising across his knuckles. Because the victim was a "tiny baby" who was fussy and had multiple bruises, Dr. Ragsdale was concerned that the victim had been injured and advised Barnes to have the victim assessed by a child abuse team at Vanderbilt. Barnes agreed to take the victim to the hospital immediately.

Dr. Ragsdale opined that Barnes' demeanor was typical of a shocked mother who did not know how her child was injured and that Barnes was agreeable to further investigation. Dr. Ragsdale continued to be the victim's doctor after the discovery of his injuries. The victim had no injuries after January 8.

Dr. Deborah Lowen testified that she was the head of the Center for Child Protection and Well-Being, also known as the CARE Team, at Vanderbilt. She explained that the CARE Team "evaluate[d] children when there are concerns about the possibility of abuse or neglect." Without objection, Dr. Lowen testified as an expert in the field of child abuse pediatric medicine.

On the evening of January 8, 2014, someone from Vanderbilt's emergency department called Dr. Lowen and advised her that the victim had been admitted due to concerns of abuse or neglect. Dr. Lowen saw the victim on the morning of January 9 for a formal consultation.

During her examination of the victim, Dr. Lowen noticed he had several external areas of bruising: right ear, right forearm, several fingers of the right hand, right palm, and left calf. The victim was only two months old; therefore, he did not have enough strength to have bruised himself. Moreover, he had bruises on different parts of his body and no history of accidental injury. Accordingly, the bruising "happened multiple times." Dr. Lowen said that bruising "at any location on a baby at this age in this developmental ability is very concerning." She could not say when the bruising occurred.

Because of lung issues, the victim had x-rays taken of his chest area on December 24, 2013, and on January 3, 2014. At that time, no fractures were noticed on the x-rays.

- 8 -

After the victim's bruises were discovered, x-rays were taken on January 8, 2014, which clearly revealed that the top rib on the right side was fractured. Additionally, because the x-rays reflected that blood was around the lung, the doctor was concerned that some of the lower ribs on the right side also were fractured. Follow-up x-rays on January 31, 2014, revealed that the victim had a total of seven healing rib fractures, all on the right side of the body.

Dr. Lowen concluded that the victim's rib fractures occurred after January 3, noting that it took fractures seven to ten days to show signs of healing on an x-ray. She explained that new rib fractures could be difficult to detect until they began to heal and bony calluses formed. The victim had no bruising on his chest associated with the fractures, which was typical with acute rib fractures "in little babies." Dr. Lowen stated that the fractures would have caused the victim to exhibit fussiness, irritability, and difficulty in getting comfortable.

Dr. Lowen noted that the top rib was "relatively protected" because it was underneath the collarbone and that fracturing it required "substantial force . . . that [was] well outside that of normal caregiving." The fractures could not be caused by swaddling unless it was done in a "very forceful, aggressive manner with somebody manipulating the chest." Dr. Lowen and radiologists examined all of the victim's x-rays and determined that the fractures were in "different stages of . . . healing."

A CT scan revealed that the victim had a cortical contusion, which was "bruising to the very top of the brain, the very outside part of the brain." Dr. Lowen was concerned about subdural bleeding, although it had not been revealed clearly by the CT scan. Accordingly, an MRI was performed, which revealed that the victim had "bleeding around the brain called [a] subdural hematoma." The cortical contusion and subdural hematoma were "separate and distinct injuries" that were the result of "abusive head trauma." The victim's head trauma would have caused him to exhibit fussiness, irritability, and possibly a low-grade fever. Dr. Lowen concluded that the victim's injuries were the result of "child physical abuse."

Dr. Lowen recalled that during her evaluation of the victim, Barnes was forthcoming about the victim's family and medical history. Barnes was "upset in an appropriate way" about the victim's injuries and "expressed a lot of guilt."

On cross-examination, Dr. Lowen testified that she would have been concerned about abuse "in a baby this age" even by a single bruise. Because the victim had a number of other injuries, she concluded that he had been injured in "multiple different ways." Dr. Lowen opined that "some of the rib fractures were at different ages." The cortical contusion was "relatively recent" but could not be dated with specificity. Dr. Lowen noted that subdural hematomas were "difficult to date."

On redirect examination, Dr. Lowen testified that if the victim had come to the hospital with only bruising, only rib fractures, or only the brain injuries, she would have diagnosed him with nonaccidental child abuse. The combination of injuries signaled that the victim "has been a victim of child abuse . . . involving multiple different parts of his body."

Dr. Gabriella Crane, a pediatric radiologist at Vanderbilt, testified without objection as an expert in her field. Dr. Crane explained that the ends of a new rib fracture often did not separate, making the fracture difficult to see on an x-ray. Instead, doctors or radiologists had to look for secondary signs of a new rib fracture such as swelling or bleeding.

Dr. Crane testified that the victim came into Vanderbilt's emergency room on December 24 because he had shortness of breath and that chest x-rays were taken. She examined those x-rays and detected no rib fractures. The victim returned to the emergency room on January 3 due to acute bronchiolitis, which was a type of respiratory infection. X-rays were taken of the victim's lungs but also showed the ribs. Dr. Crane examined the January 3 x-rays and could see no clear fracture lines in the ribs. However, she saw blood in the pleural space between the right lung and ribs five, six, and seven. The blood was originally "read" as "a little inflammation." However, Dr. Crane opined that it was a subtle finding of rib fractures.

The victim's January 8 x-rays revealed a widening in the pleural space between the right lung and ribs five, six, and seven as well as new fractures on ribs one, two, eight, and nine. The fractures on ribs eight and nine were more subtle than the fractures on ribs one and two. The fractures led Dr. Crane to believe that the rib fractures occurred from at least "two episodes of trauma."

When Dr. Crane examined the victim's January 31, 2014 x-rays, she confirmed that he had "multiple rib fractures of different stages of healing," all on the right side of his body. The victim had seven total rib fractures, specifically fractures to ribs one, two, five, six, seven, eight, and nine. All of the fractures had thick, bony calluses around them, signifying they were in the late stages of healing.

On cross-examination, Dr. Crane explained that no broken ribs were noted at the time the January 3 x-rays were taken. However, when the January 3 x-rays were examined again at a later date, she saw fluid in the pleural space next to ribs five, six, and seven which indicated "bleeding from the ribs." The January 8 x-ray reflected that ribs five, six, and seven were in the process of healing and were close to one week old.

Detective David Bohler testified that he was a member of the Child Protective Investigating Team (CPIT), which was a part of the Criminal Investigation Division of the Fairview Police Department. CPIT was comprised of law enforcement officers from

the Williamson County area, DCS workers, members of the district attorney general's office, and members of the Child Advocacy Center in Williamson County.

Around 8:30 p.m. on January 8, DCS employee Jeanine Hall called Detective Bohler to inform him that a two-month-old infant with suspicious injuries was admitted into Vanderbilt. When Detective Bohler arrived at Vanderbilt sometime between 9:30 and 10:00 p.m., Hall introduced him to Dr. Rebecca Kidd. Dr. Kidd described the victim's injuries to Detective Bohler, advised him that the injuries were the result of non-accidental trauma, and showed him photographs of the injuries. Detective Bohler noted that the victim had several bruises in "suspicious" locations.

When Detective Bohler entered the victim's hospital room, he saw that Barnes' eyes were red and moist, indicating she had been crying. Her voice was shaky, and she appeared nervous and upset. She was willing to speak with Detective Bohler and was forthcoming with information concerning where and with whom the victim had been prior to his injuries. Barnes showed Detective Bohler the text messages she and the Appellant had exchanged earlier that evening. Detective Bohler and Barnes spoke for forty-five minutes to one hour.

Dr. Kidd informed Detective Bohler that the victim had signs of a possible contusion and/or bleeding under his skull, which was later confirmed by follow-up testing. On the night of January 8, Detective Bohler did not know about the victim's rib fractures.

Detective Bohler initially considered everyone who had had contact with the victim to be a suspect, and he spoke with all of the suspects. He was able to verify the information Barnes gave him, finding her statements to be "consistent and truthful." He also eliminated Dructor, Newberry, Ben, and Angela as injuring the victim. Eventually, he concentrated on the Appellant as the perpetrator.

Detective Bohler explained that he saw a text message the Appellant sent to Barnes, acknowledging that the Appellant had seen the victim's bruises before Barnes took the victim to the pediatrician. Given the severity of the victim's bruises, Detective Bohler did not understand the Appellant's failure to call 911. Detective Bohler, a father of three children, did not believe the Appellant's claim that the victim's injuries were caused by the Appellant's swaddling the victim "too hard." Detective Bohler said the Appellant's text messages were inconsistent with each other, noting that the Appellant initially told Barnes he did not see the victim's bruises until the morning of January 8 but later said he had seen the bruises the previous night.

Detective Bohler learned that the victim had a regularly-scheduled appointment at Old Harding Pediatrics on January 8. He opined that if Barnes had caused the victim's

bruises, she probably would not have kept the appointment because she would have known the bruises would be discovered.

Detective Bohler asked Barnes to make a recorded, controlled telephone call to the Appellant. Barnes agreed and made the call from the victim's hospital room on January 10. Barnes called the Appellant's workplace because the Appellant had changed his telephone number the day after the injuries were first discovered, and she had no other way to contact him. During the call, the Appellant told Barnes that he had changed his telephone number because he was being harassed. However, Detective Bohler examined the Appellant's telephone records and determined that the Appellant's claim was not supported. Additionally, Detective Bohler opined that the Appellant changed his telephone number so quickly that he could not have suffered much, if any, harassment.

In order to make the Appellant think the police suspected someone else, Detective Bohler and his partner, Officer Jennifer Beech, "set up a ruse" by informing the Appellant's mother that they "were following up on a Dickson County investigation into" Barnes. Officer Beech then tried to arrange an interview with the Appellant. She initially was unable to contact him, but he left a voicemail message on her telephone. Thereafter, Officer Beech contacted the Appellant's supervisor at Sonic and obtained permission for the Appellant to leave work for the interview.

The officers arrived at Sonic at 9:00 a.m., and the Appellant voluntarily rode to the police department with Officer Beech. After arriving at the police department, Officer Beech advised the Appellant of his <u>Miranda</u> rights, and he agreed to speak with the officers. While Officer Beech and the Appellant talked, Detective Bohler sat at a side desk and acted "disinterested." Officer Beech asked the Appellant to provide a handwritten statement describing his last interaction with the victim. The Appellant wrote that he and Barnes began dating about October 15, 2013. He said the relationship was rough from the beginning, maintaining that Barnes had an aggressive nature and would fight until she got her way. He said he knew from the start that he had to "tread lightly" around Barnes. Barnes told the Appellant, Angela, and Ben about her past, including how she had been abusive toward her loved ones. The Appellant said he generally let Barnes have her way. Near the end of their relationship, Barnes' stress level increased beyond normal, and she took it out on her eight-year-old son. The Appellant said the victim was "tossed around" from one house to the next, and the Appellant offered to pay for one babysitter but Barnes would not allow it. Barnes would come to the Appellant's house, hand the victim to the Appellant, and take a nap. The Appellant usually left the victim sleeping in his car seat. When the victim awoke, the Appellant would change his diaper, return him to his car seat, and turn the car seat to face the television. The week prior to the discovery of the victim's injuries, the Appellant "stayed up with him every night and he slept through most nights." If the victim did not sleep through the night and woke crying, Barnes stormed into the living room, violently snatched the victim from the Appellant's hands, and stormed back to Dominic's room to

- 12 -

lie down with the victim to sleep. Since the discovery of the victim's injuries, Barnes had "harassed [the Appellant] and accused [him] along with all of [his] loved ones." The Appellant did not recall any events with him or his family "that could have caused this."

After the Appellant finished his handwritten statement, the officers began to talk about what allegedly happened on January 8. Detective Bohler acted as if he had not heard about the victim's injuries. The Appellant then asked to write an addendum to his statement. In the addendum, the Appellant wrote that on January 8, Barnes took the victim to a doctor's appointment. Thereafter, she called the Appellant and accused him of causing the victim's injuries. She then included Ben and Angela in the accusation. The Appellant noted that Angela was at work the entire day, that Dominic was at work with her, and that Ben was at the house that day. Barnes told the Appellant that the victim had bruising behind his ear, on the palm of his hand, on his knuckles, and on his legs. Additionally, he had internal bleeding and bleeding on his brain. The Appellant wrote, "When he left my supervision, none of these marks were present."

Detective Bohler asked the Appellant to explain why he told the police that no marks were on the victim when the victim left the Appellant's supervision but told Barnes he had seen bruises on the victim the night of January 7 and the morning of January 8. The Appellant denied making such a statement to Barnes. Detective Bohler then showed the Appellant a copy of the text messages Barnes and the Appellant exchanged. The Appellant seemed "surprised" and said, "Oh, oh, yeah, that, yes, I guess I did see that. There was like a little red dot in the palm of his hand, and maybe something on his knuckle, whatever. Yeah, I do remember seeing that." Detective Bohler thought the Appellant's response indicated that he was "covering" after being caught in a lie.

Detective Bohler showed the Appellant a photograph of the victim's injuries. The Appellant maintained that the injuries he had seen had not looked as severe as the injuries in the photograph. The Appellant initially described the marks on the victim as red dots, but as he continued to speak, he also described the marks as purple. The Appellant originally told Detective Bohler that he showed Barnes the marks on the victim on the morning of January 8. However, after being shown the text messages, the Appellant acknowledged he mentioned the marks to Barnes on the night of January 7.

Detective Bohler was aware that the Appellant had served in the military and decided to engage the Appellant in a discussion about military service. Detective Bohler wanted to build a rapport with the Appellant based upon their shared experience of being in the Army. The Appellant told Detective Bohler that he had been a medic and that he had attended Airborne School. He said he had been selected to serve as a medic for the "First Ranger Regiment on a top secret mission to Afghanistan in support of the 3rd Brigade, 3rd Infantry Division," which was assigned to Kelley Hill, Fort Benning. Detective Bohler testified that that brigade was the last one he had served in while on

active duty. Detective Bohler was familiar enough with Army practices to know that the Appellant's claim was not truthful for a number of reasons.[4] Detective Bohler told the Appellant that he was young and should consider returning to military service, and the Appellant responded that he was considering it. Detective Bohler knew the Appellant was ineligible for reenlistment due to the circumstances of his discharge. Detective Bohler asked the Appellant if he had lied about anything while speaking with the police, and the Appellant acknowledged that he had lied about being eligible for reenlistment.

The Appellant told Detective Bohler that Barnes called him at approximately 5:00 p.m. on January 8 while Ben was driving the Appellant to work at Sonic. The Appellant talked with Barnes and ended the call as he walked into the restaurant. Telephone records did not back up the Appellant's claim. Additionally, the telephone records revealed "[t]hat there was no substance to [the Appellant's] statement that he was being harassed." Detective Bohler noted that the Appellant initially said Barnes "snatched" the victim from him on the night of January 7 but then said he took the victim to Barnes in the bedroom and handed the victim to her.

On cross-examination, Detective Bohler testified that no controlled calls were placed to any other suspects. Ben told Detective Bohler that "he was never within three feet of the baby" and that he never saw or heard anything he thought was abuse. The Appellant told Detective Bohler that he never intentionally harmed the victim.

Jennifer Dructor testified that she provided childcare for the victim when he was a baby. At that time, her then-boyfriend, Eric Newberry, lived with her. She usually babysat the victim four days a week, including the Monday before the victim's bruises were discovered. Dructor denied injuring the victim or treating him in a way that would cause him injury. She noted that Newberry was gentle and caring with the victim.

Dructor said Barnes never did anything to make Dructor afraid of her and opined that Barnes was a good mother who loved her children. Dructor did not recall babysitting the victim after his injuries were discovered but acknowledged that she could have.

On cross-examination, Dructor testified that she thought she started babysitting the victim when he was six months old. However, she did not question that the victim was two and one-half months old when his injuries were discovered. She acknowledged that she may have babysat the victim once or twice after his injuries were discovered. She asserted that she cared for the victim as if he were a member of her family.

---

[4] Detective Bohler explained that the Army "can't deploy a mechanized infantry division in secret." Additionally, he asserted that the Rangers did not select members straight from Airborne School and did not support a mechanized infantry division. Detective Bohler also knew that the duration of the Appellant's military service did not allow for a deployment such as the Appellant described and that the 3rd Brigade, 3rd Infantry Division did not deploy as a brigade at any time to Afghanistan.

Eric Newberry testified that he never noticed any injuries on the victim and never noticed Dructor treating the victim harshly. Newberry and Dructor "almost treated [the victim] like he was a porcelain doll with all of his premie issues and everything." Newberry thought Barnes appeared to be a loving and attentive mother.

Dr. Rebecca Kidd, an emergency medicine physician at Vanderbilt, testified that she was one of the doctors who treated the victim when he came into the emergency room. Dr. Kidd stated that Barnes was "very kind and appropriately concerned about her child."

Dr. Kidd observed that the victim's pediatrician allowed Barnes to bring the victim to the hospital. She opined that if the pediatrician had been concerned that Barnes had caused the victim's injuries, the pediatrician would have called an ambulance instead of allowing Barnes to leave with the victim.

Tonya Pezzi testified that she and Barnes had known each other for approximately ten years. In 2013, right after the victim was born, Pezzi allowed Barnes to move into her apartment until Barnes could find her own apartment. Barnes stayed at Pezzi's apartment approximately fifty percent of the time and with the Appellant the rest of the time. Pezzi never saw any injuries to the victim, and she was surprised when Barnes informed her about the victim's injuries. Pezzi said Barnes was a loving, good mother.

At the close of the State's proof, defense counsel argued that the State was required to elect a specific injury on which to proceed on each count of the indictment in order to ensure jury unanimity, noting that the victim had multiple rib injuries, multiple brain injuries, and multiple bruises. The State ultimately elected to proceed on count one with the fracture to rib one, on count two with the subdural hematoma, and on count three with the bruising to the victim's hand. The Appellant did not testify or present any proof, and the jury convicted him as charged. The trial court sentenced the Appellant as a Range I, standard offender to twenty-five years for each aggravated child abuse conviction and eight years for the child abuse conviction. The sentences were to be served concurrently for a total effective sentence of twenty-five years.

## II.  Analysis

### A.  Rule 404(b)

The Appellant contends that the trial court erred by finding that certain statements he made to Detective Bohler were admissible under Tennessee Rule of Evidence 404(b). The State argues that the trial court did not abuse its discretion by admitting the statements. We agree with the State.

During a pause in jury selection, the State advised the trial court that it wanted to address in its opening statement "the lies that the defendant told Detective Bohler" about his military service. Defense counsel objected, arguing that the Appellant's statements were inadmissible because the State was seeking to introduce them to show the Appellant's character for untruthfulness. The trial court initially noted that the Appellant's untruthful statements were admissions by a party opponent and, therefore, qualified as an exception to the hearsay rule under Tennessee Rule of Evidence 803(1.2). The court then asked the State to explain how the statements were relevant. The State responded that the Appellant's untruthful statements were relevant to show why Detective Bohler "zeroed in on him as the primary suspect." The State advised the court that while the statements "[did] go to show that the defendant was untruthful," the Appellant had questioned potential jurors during voir dire about whether they would be willing to consider another suspect as the culprit for the victim's injuries; therefore, the State had a right to show that Detective Bohler "did consider other suspects, but that his radar was heightened by the defendant's own actions, . . . him being motivated to present himself in a better light, which would show a guilty conscience." The trial court ruled that it needed to hear from Detective Bohler in order to "sort this out" and that it would hold a jury-out hearing. Until then, the State could not mention the Appellant's lying to Detective Bohler in its opening statement.

On direct examination, Detective Bohler testified that he developed a "pool of suspects" in this case that included Jennifer Barnes, Jennifer Dructor, Eric Newberry, Tonya Pezzi, Ben and Andrea Hendrix, and the Appellant. Detective Bohler said he then began "whittling down who could have possibly done this." At that point, the State requested that the trial court hold the jury-out hearing.

During the hearing, Detective Bohler testified that the Appellant agreed to an interview at the police department. Detective Beech primarily handled the interview while Detective Bohler sat off to the side and acted disinterested. After the Appellant gave a written statement, Detective Bohler became more involved in the interview and tried to build a rapport with the Appellant by sharing experiences about their military service. The Appellant told Detective Bohler that he was a medic for a first ranger regiment and that he had been deployed to a top secret location he could not discuss with the police. The Appellant said the deployment was in support of the 3rd Brigade, 3rd Infantry Division, which happened to be the last unit Detective Bohler had served in when he was on active duty. Detective Bohler knew that such a mechanized infantry brigade could not be deployed in a top secret capacity. The Appellant also told Detective Bohler that he was eligible to reenlist, which Detective Bohler knew was false.

Detective Bohler testified that in addition to the Appellant's lying about his military service, other parts of the Appellant's interview heightened his suspicions of the Appellant. For example, the Appellant wrote in his statement that "'there were no marks on that child when he left my supervision'" but told Barnes in a text message that he did

- 16 -

see marks on the victim.  Detective Bohler confronted the Appellant about the inconsistencies, but the Appellant only admitted lying about his military service.

At the conclusion of Detective Bohler's testimony, defense counsel again argued that the Appellant's false statements were inadmissible because "the only purpose in introducing these statements would be to attack the defendant's character for truthfulness."  The State countered that the Appellant's statements were admissible under Tennessee Rule of Evidence 404(b) to show identity.  Defense counsel argued that the Appellant's lies to the officer did not fall under the scope of Rule 404(b) because they were not "prior bad acts."  Moreover, defense counsel argued that even if the trial court determined that Rule 404(b) applied, the danger of unfair prejudice outweighed the probative value of the statements.

The trial court acknowledged that the testimony related to the Appellant's credibility but found that the Appellant's false statements to Detective Bohler were bad acts that fell under Rule 404(b).  The court also found that the material issue other than conduct conforming with a character trait to which the statements were pertinent was the issue of identity.  The trial court noted that the case was "clearly a circumstantial evidence case" and that the identity of the perpetrator was the central issue of the case. The trial court further found that the State produced clear and convincing evidence of the statements and noted that the probative value of the testimony was not outweighed by the danger of unfair prejudice.  On appeal, the Appellant challenges this ruling.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  Generally, "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible."  Tenn. R. Evid. 402.  However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404 provides:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:
>
> > (1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992).

"If there is no Rule 404(b) issue, the question becomes whether the evidence should have been admitted under Rules 401 and 402." State v. Jennifer Hannah, No. M2012-00842-CCA-R3-CD, 2014 WL 117400, at *12 (Tenn. Crim. App. at Nashville, Jan. 14, 2014) (citing State v. DuBose, 953 S.W.2d 649, 653 (Tenn. 1997)). The admission of evidence under Rules 401, 402, 403, and 404(b) are all reviewed under an abuse of discretion standard; however, "the decision of the trial court [regarding the admission of 404(b) evidence] should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." DuBose, 953 S.W.2d at 652; see State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

In the instant case, the State was not seeking to use Detective Bohler's testimony to show that the Appellant had a propensity to lie or that his propensity to lie made it more likely he physically abused the victim. Instead, the State wanted to use Detective Bohler's testimony to show that the Appellant's lying about his military service during his interview, along with other inconsistencies, caused the detective to identify the Appellant as his primary suspect. Therefore, Rule 404(b) does not bar admission of the testimony.

Moreover, while we agree that the Appellant's lying about his military service was highly prejudicial, the Appellant's strategy throughout the trial was that the police unfairly targeted him during their investigation. In defense counsel's opening statement, he said that there was "the rush to judgment to point the finger" at the Appellant. During Detective Bohler's cross-examination, Detective Bohler acknowledged that he used a controlled telephone call and "trickery" on the Appellant but not the other suspects. In

- 18 -

closing arguments, defense counsel stated that the Appellant "was the suspect from the start" and that Detective Bohler focused only on the Appellant. Therefore, Detective Bohler's testimony as to why he identified the Appellant as his primary suspect was relevant and highly probative to the State's case. Accordingly, we cannot say that probative value of the evidence was substantially outweighed by the danger of unfair prejudice and conclude that the Appellant is not entitled to relief.

## B. Merger

The Appellant contends that his three convictions violate double jeopardy; therefore, they must be merged into a single conviction of aggravated child abuse. The State contends that the trial court properly refused to merge the convictions. We agree with the Appellant that the convictions must be merged.

The grand jury indicted the Appellant in count one for aggravated child abuse "resulting in serious bodily injury to the child, to wit: a fracture to any bone." The grand jury also indicted the Appellant in count two for aggravated child abuse resulting in serious bodily injury and in count three for child abuse; however, neither count specified the injury. The Appellant filed a motion for a bill of particulars, and the State filed a response, arguing that a bill of particulars was not required because the Appellant had received sufficient information about the charges in the wording of the indictment and through open file discovery.

During a pretrial hearing on the Appellant's motion, defense counsel argued that a bill of particulars was necessary because the defense did not know if count two was alleging an alternate theory of injury to the injury alleged in count one, which would require merger of counts one and two upon conviction, or if "the State is taking the position . . . that two separate instances of aggravated child abuse can be substantiated from the proof at trial." Similarly, defense counsel argued that a bill or particulars was necessary because the defense did not know if the State was relying on a specific injury to support the child abuse conviction in count three or if count three was a lesser-included offense of count one in the event the State could not prove serious bodily injury in count one. The State responded that it was relying on "a broken bone," for the serious bodily injury in count one; "a brain contusion," for the serious bodily injury in count two; and "bruising on the hand in the palm and on the back," for the bodily injury in count three.

The trial court noted that the medical records reflected that the victim sustained two broken ribs, a brain contusion, and bruising on the hand and that it appeared from the records that "these injuries were part of the same transaction or occurrence." The State responded that the pediatric radiologist was going to testify about "two separate injuries" to the ribs but that, otherwise, the State agreed with the trial court. The trial court overruled the Appellant's motion for a bill of particulars, finding that the discovery materials provided to the Appellant gave him sufficient notice of the offenses charged.

- 19 -

Nevertheless, the trial court "urge[d]" the State to file a bill of particulars. The State did so four days later, informing the Appellant that count one referred to "injury to the victim's ribs/rib," count two referred to "injury to the victim's brain," and count three referred to "bruising of the victim's skin."

At the close of the State's proof, defense counsel requested that the trial court require the State to elect a single count of the indictment on which to proceed. Defense counsel contended that the State was pursing three convictions based on separate injuries, not separate acts of abuse, to the victim. In support of his claim, defense counsel cited State v. Adams, 24 S.W.3d 289 (Tenn. 2000), in which our supreme court required that the State elect one specific injury for the charge of aggravated child abuse. The State responded that the defense was "confusing different points of law," noting that an election was necessary when a single count could refer to multiple injuries. The State argued that election was not required in this case because the Appellant had been charged in three separate counts for three separate injuries. The State then stated as follows:

> If at the time the jury returns a verdict of guilt on all three counts, and it's determined to be [one] incident that can't be properly broken up, the Court shall then merge them. However, I don't believe merger will apply. But that's the difference, he's trying to confuse election with merger.

The trial court ruled that all three counts would go to the jury, and the jury convicted the Appellant as charged.

At sentencing, the Appellant contended that the State's theory was that all of the injuries occurred sometime between the evening of January 7 and the afternoon of January 8. The Appellant further contended that because the State failed to prove exactly how or when the victim's injuries occurred, "the State failed to prove that they weren't all caused through the same act or transaction." The State asserted that because it elected three separate injuries, all of which were in different areas of the body that could not be "tied" to each other, the Appellant committed separate and distinct acts of harm to the victim. Therefore, the convictions should not merge.

The trial court ruled the merger was not necessary, stating as follows:

> [T]he nature of these injuries is so separate and distinct that the trier of fact just simply could not have found they occurred simultaneously. You've got a subdural hematoma, [which] would give support for the conviction in Count II. You've got the broken rib[] that support[s] the conviction in Count I.
>
> . . . .

- 20 -

And then you've got the bruising to the hand, palm, and the back of the hand, which support[s] the conviction in Count III.

It goes back to the case where you had the injured child that had bruising to the chest and internal injuries. The Court there said based upon medical proof, that it's completely consistent that a child that's got internal injuries would also display external of evidence of that through [bruising]. In this case, we've got medical doctors who testified concerning three very distinct injuries and in the Court's mind, the logic does not at all lead to the conclusion that it would be a single act that would result in three distinct injuries of the nature that we have in this case.

The double jeopardy clauses of the United States and Tennessee Constitutions protect an accused from (1) a second prosecution following an acquittal; (2) a second prosecution following conviction; and (3) multiple punishments for the same offense. See State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). The instant case concerns the third category, protection against multiple punishments for the same offense in a single prosecution. Multiple convictions for the same offense violate federal and state constitutional prohibitions against double jeopardy. See U.S. Const. amend. V; Tenn. Const. art. I, § 10. "It is well settled in Tennessee that, under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications." State v. Berry, 503 S.W.3d 360, 362 (Tenn. 2015). "Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness." State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014).

"Multiple punishment claims fall into one of two categories: (1) unit-of-prosecution claims; or (2) multiple description claims." State v. Hogg, 448 S.W.3d 877, 885 (Tenn. 2014) (citing Watkins, 362 S.W.3d at 543). "Unit-of-prosecution claims arise when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the same offense." Watkins, 362 S.W.3d at 543. "Multiple description claims arise in cases in which defendants who have been convicted of multiple criminal offenses under different statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" Id. at 544.

The Appellant's dual convictions of aggravated child abuse resulting in serious bodily injury present a unit-of-prosecution claim. "'In determining the unit of prosecution, we first examine the statute in question to determine if the statutory unit of prosecution has been expressly identified.' If the unit of prosecution is clear from the statute, there is no need to review the history of the statute and other legislative history." Hogg, 448 S.W.3d at 885 (quoting State v. Smith, 436 S.W.3d 751, 768 (Tenn. 2014)). However, "any ambiguity in defining the unit of conduct for prosecution is resolved

against the conclusion that the legislature intended to authorize multiple units of prosecution." Watkins, 362 S.W.3d at 543 (citing Gore v. United States, 357 U.S. 386, 391-92 (1958)).

Our Code defines aggravated child abuse as follows:

(a) A person commits the offense of aggravated child abuse, . . . who commits child abuse, as defined in § 39-15-401(a) . . . and:

(1) The act of abuse . . . results in serious bodily injury to the child;

. . . .

(d) "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tenn. Code Ann. § 39-15-402(a)(1), (d) (emphasis added). Child abuse occurs when "[a]ny person knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . . ; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony." Tenn. Code Ann. § 39-15-401(a) (emphasis added). Thus, both statutes appear to specify that the unit of prosecution intended is each act that inflicts injury, not the injury itself.

Moreover, while our courts have not specifically addressed a unit-of-prosecution issue in relation to aggravated child abuse or child abuse cases, we find the following case helpful. In State v. Glenn Lydell McCray, No. M2011-02411-CCA-R3-CD, 2013 WL 1870872, at *14 (Tenn. Crim. App. at Nashville, May 2, 2013), the jury convicted the defendant of two counts of aggravated assault with a deadly weapon on one victim. One conviction related to the defendant's causing the victim reasonably to fear imminent bodily injury by using or displaying a rifle, and the second conviction related to the defendant's causing the victim reasonably to fear imminent bodily injury by using or displaying a knife. Id.; see Tenn. Code Ann. § 39-13-101(a)(2), -102(a)(1)(A)(iii). In analyzing the defendant's unit-of-prosecution claim under Watkins, this court determined that the defendant committed two aggravated assaults: first by assaulting the victim with the rifle and later by assaulting her with the knife when she tried to leave their apartment. Glenn Lydell McCray, No. M2011-02411-CCA-R3-CD, 2013 WL 1870872, at *14. Accordingly, because the defendant's "attack was not continuous, the aggravated assaults were separate and distinct offenses" and did not violate double jeopardy principles. Id.

In reaching its conclusion, this court also distinguished the facts in <u>Glenn Lydell McCray</u> from the facts in <u>State v. Pelayo</u>, 881 S.W.2d 7 (Tenn. Crim. App. 1994), a pre-<u>Watkins</u> case. In <u>Pelayo</u>, the defendant was charged with one count of aggravated assault causing serious bodily injury to the victim and one count of aggravated assault causing bodily injury to the victim by using or displaying a deadly weapon. 881 S.W.2d at 12. Our supreme court noted that although the State appeared to charge the defendant under two separate theories of aggravated assault, the State argued at trial that a stab wound to the victim's arm and a stab wound to the victim's leg supported the two separate convictions. <u>Id.</u> In finding that the dual convictions violated double jeopardy principles, our supreme court explained that while the defendant stabbed the victim's arm inside her house and stabbed her leg after she ran outside, the defendant committed only one aggravated assault because the stabbings "coalesced into an 'unmistakable single act,' though separated by a few seconds and feet." <u>Id.</u> at 13. The court then stated as follows:

> Our conclusion is bolstered by the fact that the aggravated assault statute, though listing several methods of commission, focuses on the act of causing injury, fear, or physical contact. We finding nothing in the statute to indicate that the legislature intended for defendants to be punished separately for each blow or injury.
>
> . . . .
>
> Therefore, we conclude that the factual circumstances of this case do not merit separate convictions. Further, we are convinced that the legislature did not intend for defendants committing acts of aggravated assault to be punished separately for each individual blow. This opinion is not intended to suggest that separate blows inflicted on the same victim at times and places more distinct than involved in this case cannot provide sufficient grounds for multiple convictions.

<u>Id.</u>

Like the aggravated assault statute, we conclude that the aggravated child abuse statute focuses on the act resulting in injury and that the legislature did not intend for defendants charged with aggravated child abuse to be punished separately for each individual injury. Instead, the unit of prosecution is the act that caused the injury.

The State argues that it "elected particular injuries for each offense in a way that allows this Court to conclude that the jury did not convict Hendrix more than once for each of them" and relies on <u>State v. Glenn Climer, Jr.</u>, No. M2013-00651-CCA-R3-CD, 2014 WL 2734109 (Tenn. Crim. App. at Nashville, June 16, 2014), in support of its argument. In <u>Glenn Climer, Jr.</u>, employees at a hospital observed the defendant

"behaving bizarrely" in the parking lot. No. M2013-00651-CCA-R3-CD, 2014 WL 2734109, at *5. A security supervisor approached the defendant and saw that he was holding his one-year-old son. Id. at *1. The baby had a bruise on his face. Id. at *2. The defendant, still holding his son, got into a car with the security supervisor and calmed down briefly. Id. However, after the police arrived and got into the car with the defendant, the defendant began yelling and twisted the victim's neck. Id. The jury convicted the defendant as charged of attempted aggravated child abuse for holding and twisting the victim's head and neck and child abuse for the victim's facial bruise. Id. at *6. On appeal, the defendant argued that the convictions violated double jeopardy, but this court disagreed, concluding that the convictions were based on two separate and distinct acts. Id.

The State also contrasts the facts in the instant case with the pre-Watkins case of State v. Marcos Acosta Raymundo, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207 (Tenn. Crim. App. at Nashville, Nov. 10, 2010). In Marcos Acosta Raymundo, this court considered whether the defendant's convictions of attempted aggravated child abuse for the victim's internal injuries and child abuse for the victim's multiple bruises violated double jeopardy principles. This court concluded that the convictions violated double jeopardy because the victim's bruises "would have accompanied, and been inflicted at the same time as, the internal injuries. . . . Dr. Berutti discussed the victim's serious internal injuries and also stated that he had never seen a case where a child had serious internal injuries from trauma but did not have any external bruising." Marcos Acosta Raymundo, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207, at *18.

Turning to the instant case, the State was required to show that the victim's rib one fracture in count one and subdural hematoma in count two were the result of separate and distinct acts in order to sustain separate convictions of aggravated child abuse. Dr. Lowen could not say when the victim's rib fractures or subdural hematoma occurred. Dr. Crane testified that the victim suffered two episodes of trauma to the ribs. The first episode occurred sometime before the victim's x-rays on January 3, and the second episode occurred sometime after January 3 but before his x-rays on January 8. The victim's rib one fracture occurred during the second episode. Although the victim would have exhibited symptoms of his injuries such as fever, irritability, difficulty getting comfortable, and possibly fever, his mother did not testify as to noticing any symptoms that would have helped determine when his injuries occurred. Therefore, we are compelled to agree with the Appellant that the State failed to show that the victim's rib one fracture and subdural hematoma were the result of separate and distinct acts. Accordingly, his two convictions of aggravated child abuse violate double jeopardy principles and must be merged. See State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997).

The Appellant's dual convictions of aggravated child abuse resulting in serious bodily injury and child abuse present a multiple description claim. In Watkins, our

supreme court adopted a two-step process derived from Blockburger v. United States, 284 U.S. 299 (1932), in order to determine whether a multiple description claim violates the principles of due process. 362 S.W.3d at 545. "First, the threshold inquiry under Blockburger is whether the alleged statutory violations arise from 'the same act or transaction.'" Id. (citing Blockburger, 284 U.S. at 301-04). If the separate convictions are not derived from the same act or transaction, no double jeopardy violation has occurred, and courts do not need to procced to the second step of the Blockburger test. Id. However, if the convictions are derived from the same act or transaction, a court must examine the statutes to determine whether the crimes constitute the same offense. Id. (citing Blockburger, 284 U.S. at 304). If the elements are the same or one offense is a lesser included offense of the other, then the reviewing court presumes that multiple convictions were not intended by the legislature. Id. at 557.

Dr. Lowen testified that while the victim had bruising on different parts of his body, which indicated an external force had been applied multiple times, she could not say when the bruising occurred. Likewise, the victim's mother did not give any testimony to help determine exactly when the bruising on the victim's hand occurred. Thus, the proof also failed to show that the bruising was not part of the same transaction or occurrence as the rib fracture or subdural hematoma. The threshold has been met, and we turn to the statutes to determine whether the crimes constitute the same offense. Child abuse is a lesser-included offense of aggravated child abuse. Therefore, we presume that multiple convictions were not intended by the legislature and violate double jeopardy. Accordingly, the Appellant's conviction of child abuse also must merge.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' brief, we conclude that the Appellant's two convictions of aggravated child abuse and one conviction of child abuse violate double jeopardy principles and must merge into a single conviction of aggravated child abuse. The judgments of the trial court and the Appellant's twenty-five-year sentence are otherwise affirmed. The case is remanded to the trial court for the amendment of the judgments consistent with this opinion.

_____
NORMA MCGEE OGLE, JUDGE